UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| BASALITE CONCRETE PRODUCTS, LLC, and PACIFIC COAST BUILDING PRODUCTS, INC., | NO. CIV. 2:12-02814 WBS EFB |
| Plaintiffs, | MEMORANDUM AND ORDER RE: MOTION TO DISMISS |
| v. | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and CHARTIS SPECIALTY INSURANCE COMPANY, | |
| Defendants. | |

----oo0oo----

Plaintiffs Basalite Concrete Products, LLC ("Basalite"), and Pacific Coast Building Products, Inc. ("Pacific"), brought suit against defendants National Union Fire Insurance Company of Pittsburgh, PA, ("NUFIC"), and Chartis Specialty Insurance Company, ("Chartis"), alleging breach of the duty to defend in an underlying lawsuit brought by Keystone Retaining Wall Systems against plaintiffs (the "Keystone

1

1  Matter").   Defendants now move to dismiss the action under

2  Federal Rule of Civil Procedure 12(b)(6) for failure to state a

3  claim upon which relief can be granted.

4  I.   Relevant Facts and Procedural History

5          Plaintiffs are in the business of manufacturing and

6  distributing hardscape products, including structural blocks,

7  interlocking paving stones, wall systems, and retaining walls, as

8  well as ornamental and garden products.   (First Am. Compl. ¶ 22

9  ("FAC") (Docket No. 26).)   NUFIC allegedly issued Pacific a

10 general commercial liability insurance policy with an effective

11 starting date of September 29, 2009.   (Id. ¶ 17, Ex. A.)   Chartis

12 allegedly issued Basalite a general commercial liability

13 insurance policy with an effective starting date of September 29,

14 2008.   (Id. ¶ 18, Ex. B.)   The policies have substantially

15 similar terms and are referred to together as "the Policies" in

16 plaintiffs' FAC.   (Id. ¶¶ 19-21.)

17      A.   The Policies

18          1.   Personal and Advertising Injury Clause

19          Under the Policies, defendants agree to "pay those sums

20 that the insured becomes legally obligated to pay as damages

21 because of personal and advertising injury to which this

22 insurance applies," and defendants "will have the right and duty

23 to defend the insured against any suit seeking those damages."

24 (Id. Ex. A at 7-8, Ex. B at 14.)   In relevant part, "personal and

25 advertising injury means injury . . . arising out of one or more

26 of the following offenses: . . . (d) Oral or written publication,

27 in any manner, of material that slanders or libels a person or

28 organization or disparages a person's or organization's goods,

2

1 products, or services; . . . (f) the use of another's advertising

2 idea in your advertisement; [or] (g) infringing upon another's

3 copyright, trade dress, or slogan in your advertisement." (Id.

4 Ex. A at 40-41, Ex. B at 13.)  "Advertisement" is defined as "a

5 notice that is broadcast or published to the general market or

6 specific market segments about [the insured's] goods, products,

7 or services for the purposes of attracting customers."  (Id. Ex.

8 A. at 35, Ex. B at 11.)

9           The Policies contain two relevant exclusions to the

10 "personal and advertising injury" clause.  First, the Policies

11 exclude personal and advertising injury "arising out of the

12 infringement of copyright, patent, trademark, trade secret or

13 other intellectual property rights."  (Id. Ex. A at 9; Ex. B at

14 6.)  This exclusion, however, does not apply "to infringement, in

15 [the insured's] advertisement, of copyright, trade dress or

16 slogan."  (Id.)

17           Second, the Policies exclude personal or advertising

18 injury "arising out of breach of contract."  (Id. Ex. A at 8, Ex.

19 B at 5.)  This exclusion, however, does not apply to "an implied

20 contract to use another's advertising idea in [the insured's]

21 advertisement."  (Id.)

22           2.   Property Damage Clause

23           The Policies also provide that defendants will defend

24 the insured against any suit seeking damages for "property

25 damage."  (Id. Ex. A at 1, Ex. B at 1.)  "Property damage" is

26 defined as "physical injury to tangible property" or "loss of use

27 of tangible property that is not physically injured."  (Id. Ex. A

28 at 42, Ex. B at 13.)  The property damage, however, must be

3

1  caused by an "occurrence," (id. Ex. A at 1, Ex. B at 1), which is

2  defined as an "accident, including continuous or repeated

3  exposure to substantially the same general harmful conditions."

4  (Id. Ex. A at 40, Ex. B at 13).

5         B.    The Keystone Matter

6              On or about September 29, 2010, Keystone filed suit

7  against plaintiffs in the United States District Court for the

8  District of Minnesota, eventually filing a First Amended

9  Complaint and a Second Amended Complaint.  (FAC ¶¶ 23-24, Exs. C

10 & D).  The Keystone Matter included factual allegations that

11 plaintiffs improperly used Keystone's trademarks and patents

12 after breaching licensing agreements which granted plaintiffs the

13 "the right and license to utilize the Know-How, Molds, Patent

14 Rights, and Trademarks to manufacture, market and sell the

15 Products."  (Id. Ex. D ¶¶ 18-30, 54-74.)  Keystone alleged that

16 plaintiff breached the licensing agreement but continued to use

17 Keystone's trademarks and patents after Keystone requested that

18 they cease doing so.  (Id. ¶¶ 54-74.)  Keystone brought claims

19 for breach of contract, trademark infringement, patent

20 infringement, and violations of 15 U.S.C. § 1125(a) and (c).

21 (Id. ¶¶ 75-508).

22        C.    Plaintiffs' Allegations and Procedural History

23             Plaintiffs allege that the pleadings in the Keystone

24 Matter triggered a duty to defend under the Policies because the

25 Keystone pleadings alleged facts that could potentially state

26 claims for disparagement, slogan, and trade dress infringement in

27 plaintiffs' advertising, as required for coverage under the

28 "personal and advertising injury" clause.  (FAC ¶¶ 25-41.)

4

1  Plaintiffs also appear to allege that the Keystone pleadings give

2  rise to a duty to defend under the "property damage" clause.

3  (Id. ¶¶ 26, 28.)

4          Plaintiffs allege to have first tendered the defense to

5  defendants on or about November 18, 2011, and defendants denied

6  the defense on or about January 23, 2012.  (Id. ¶¶ 42-43.)

7  Plaintiffs again allegedly tendered the defense on or about

8  August 22, 2012 and August 31, 2012, this time including

9  "approximately 1,200 pages of marketing materials, brochures, and

10  other advertisements" which "were the actual documents which

11  comprised of [sic] the subject matter of the Keystone Matter."

12  (Id. ¶ 45.)

13          Defendants allegedly failed to pay for plaintiffs'

14  defense in the Keystone matter, which led to plaintiffs incurring

15  over $1,000,000 in defense costs.  (Id. ¶ 55)  The Keystone

16  Matter was allegedly settled in excess of $1,500,000.  (Id. ¶

17  56.)

18          Plaintiffs bring a claim for declaratory relief on the

19  issue of defendants' duty to accept plaintiffs' tenders of

20  defense in the Keystone Matter.  (Id. ¶¶ 58-62.)  Pacific also

21  brings a breach of insurance contract claim against NUFIC, (id.

22  ¶¶ 63-68), and a claim for bad faith breach of the covenant of

23  good faith and fair dealing against the same, (id. ¶¶ 75-81).

24  Basalite brings similar claims against Chartis.  (Id. ¶¶ 69-74,

25  82-88.)

26          Defendants filed a motion to dismiss on January 8,

27  2013.  (Docket No. 10.)  In ruling upon that motion, as for

28  plaintiffs' allegations that a duty to defend arose under the

5

1  Policies' personal and advertising injury clause, the court held

2  that "plaintiffs do not adequately allege that the pleadings in

3  the underlying Keystone Matter included facts related to

4  advertisements," and "do not allege that they ever submitted [the

5  extrinsic] materials to defendants when tendering their defense

6  and thus fail to allege how defendants knew of these materials at

7  the time of tender."  (Feb. 13, 2013 Order at 2-3 (Docket No.

8  22).)  The court also held that plaintiffs failed to adequately

9  allege a duty to defend under the property damage clause, since

10 "plaintiffs fail to allege how the underlying Keystone Matter

11 involved property damage due to an occurrence."  (Id. at 4.)  The

12 court accordingly dismissed plaintiffs' claims with leave to

13 amend, (id.), and plaintiffs filed the FAC on March 4, 2013,

14 (Docket No. 26).

15 II.  Discussion

16      To survive a motion to dismiss, a plaintiff must plead

17 "only enough facts to state a claim to relief that is plausible

18 on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

19 (2007).  This "plausibility standard," however, "asks for more

20 than a sheer possibility that a defendant has acted unlawfully,"

21 Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and "[w]here a

22 complaint pleads facts that are 'merely consistent with' a

23 defendant's liability, it 'stops short of the line between

24 possibility and plausibility of entitlement to relief.'"  Id.

25 (quoting Twombly, 550 U.S. at 557).  In deciding whether a

26 plaintiff has stated a claim, the court must accept the

27 allegations in the complaint as true and draw all reasonable

28 inferences in favor of the plaintiff.  Scheuer v. Rhodes, 416

1  U.S. 232, 236 (1974), overruled on other grounds by Davis v.

2  Scherer, 468 U.S. 183 (1984); Cruz v. Beto, 405 U.S. 319, 322

3  (1972).

4      A.    Duty to Defend Arising from the Face of the Keystone

5            Pleadings

6            Under California law, a "'liability insurer owes a

7  broad duty to defend its insured against claims that create a

8  potential for indemnity . . . . [T]he carrier must defend a suit

9  which potentially seeks damages within the coverage of the

10  policy.'"  Hudson Ins. Co. v. Colony Ins. Co., 624 F.3d 1264,

11  1267 (9th Cir. 2010) (quoting Montrose Chem. Corp. of Cal. v.

12  Superior Court, 6 Cal. 4th 287, 295 (1993)) (alterations in

13  original).  The duty to defend, however, is not unlimited, but

14  rather "is measured by the nature and kinds of risks covered by

15  the policy."  Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 19

16  (1993).  While an "insurer must furnish a defense when it learns

17  of facts from any source that create the potential of liability

18  under its policy," CNA Cas. of Cal. v. Seaboard Sur. Co., 176

19  Cal. App. 3d 598, 606 (1st Dist. 1986), "'the insured may not

20  speculate about unpled third party claims to manufacture

21  coverage,'" Bock v. Travelers Property Cas. Ins. Co., 465 Fed.

22  App'x 623, 624 (9th Cir. 2012) (quoting Hurley Constr. Co. v.

23  State Farm Fire & Cas. Co., 10 Cal. App. 4th 533, 538 (2d Dist.

24  1992)).

25            The pleadings in the Keystone Matter include factual

26  allegations that specific trademarks and patents were infringed

27  in connection with the breach of a licensing agreement between

28  plaintiffs and Keystone.  The Keystone complaint lists specific

7

1  trademarks and patents that were allegedly infringed, (see FAC

2  Ex. D. ¶¶ 64, 70), and contains separate claims for alleged

3  infringement of each trademark and patent, (id. ¶¶ 90-254, 278-

4  508), as well as unfair competition and dilution claims based on

5  use of the trademarks, (id. ¶¶ 255-277).  Keystone also brought

6  breach of contract claims in connection with the licensing

7  agreement.  (Id. ¶¶ 75-89.)

8         These patent, trademark, and breach of contract claims

9  in the Keystone pleadings are excluded from coverage under the

10  Policies. (FAC Ex. A at 8-9, Ex. B at 5-6.)  Therefore, no duty

11  to defend arose from the causes of actions alleged in the

12  Keystone Matter.  See Purplus Inc. v. Hartford Cas. Ins., Civ.

13  No. 12-03689 JSW, 2013 WL 1149768, at *6 (N.D. Cal. Mar. 19,

14  2013) ("The Adobe Complaint contained claims for infringement of

15  Adobe software and trademark infringement of Adobe trademarks.

16  As Adobe concedes, these claims are not covered by the Policy.

17  Thus, the legal causes of action in the Adobe Complaint did not

18  trigger Hartford's duty to defend.").

19         "However, factual allegations in the underlying

20  complaint may trigger an insurer's duty to defend, even if the

21  underlying 'technical legal causes of action' do not reveal a

22  potential for coverage."  Id. (citing Hudson, 624 F.3d at 1267).

23  Here, plaintiffs allege that the factual allegations in the

24  underlying Keystone pleadings give rise to "personal or

25  advertising injury" by stating potential claims for slogan

26  infringement, trade dress infringement, and disparagement in

27  plaintiff's advertising.  (FAC ¶¶ 27, 30-33, 35-40.)

28         1.   Personal or Advertising Injury

8

1        The factual allegations in the Keystone pleadings are

2    not sufficient to establish "[o]ral or written publication, in

3    any manner, of material that slanders or libels a person or

4    organization or disparages a person's or organization's goods,

5    products, or services; . . . (f) the use of another's advertising

6    idea in [plaintiffs'] advertisement; [or] (g) infringing upon

7    another's copyright, trade dress, or slogan in [plaintiffs']

8    advertisement," as required to allege a "personal or advertising

9    injury" under the Policies.  (Id. Ex. A at 40-41, Ex. B at 13

10   (emphasis added).)

11        "'[A]dvertising injury' must have a causal connection

12   with the insured's advertising activities before there can be

13   coverage."  Bank of the West v. Superior Court, 2 Cal. 4th 1254,

14   1277 (1992).  "In other words, any of the policy's enumerated

15   advertising injuries must be caused by [the plaintiffs']

16   advertising in order to satisfy Bank of the West's nexus

17   requirement."  Simply Fresh Fruit, Inc. v. Cont. In. Co., 94 F.3d

18   1219, 1221 (9th Cir. 1996).

19        Even when a complaint uses the word "advertising" in

20   framing a trademark cause of action, "references to the term

21   'advertisement' do not transform trademark infringement

22   allegations into advertising injuries."  Purplus, 2013 Wl 1149768

23   at *6; see also Microtec Research, Inc. v. Nationwide Mut. Ins.

24   Co., 40 F.3d 968, 971 (9th Cir. 1994) (holding that no

25   "advertising injury" or "personal injury claim" was potentially

26   stated when the third party pleadings "[did] not aver that

27   Microtec had said anything negative about [the third party],"

28   "[did] not allege that Microtec used stolen code in its ads, as

1  one might use a copyrighted piece of music in an ad," and "the

2  harm . . . [was] allegedly cause by misappropriation of the code,

3  not by the advertising itself"); Bank of the West, 2 Cal. 4th at

4  1275 (explaining that "a claim of patent infringement does not

5  'occur in the course . . . of advertising activities' within the

6  meaning of the policy even though the insured advertises the

7  infringing product, if the claim of infringement is based on the

8  sale or importation of the product rather than the

9  advertisement").

10        Here, the Keystone pleadings' passing reference to

11  "Know-How," which is defined to include "technical data, trade

12  secrets, designs, plans, specifications, methods, processes,

13  systems, manufacturing and installation procedures, marketing

14  strategies, and any other information and documentation . . .

15  useful in the manufacture, use installation, and/or sale of the

16  product," (FAC Ex. D ¶ 57 (emphasis added)), is not sufficient to

17  state an advertising injury.  Nor is a single allegation that

18  "unauthorized use of the Trademarks is commercial advertising

19  that misrepresents the nature, characteristics, qualities, or

20  origin of the Trademarks," (id. Ex. B at ¶ 257).  See Purplus,

21  2013 WL 1149768 at *6.  In the Keystone pleadings, "the harm . .

22  . is allegedly caused by misappropriation of the [trademarks and

23  patents], not by the advertising itself."  See Microtec, 40 F.3d

24  at 971.  "A party cannot excise particular words or phrases from

25  their context so as to manufacture coverage."  Purplus, 2013 WL

26  1149768 at *6.

27        Since the Keystone Matter did not include factual

28  allegations of "personal and advertising injury" under the

10

1  policy, the duty to defend did not rise from the face of the

2  Keystone pleadings.  Further, as the court will explain below,

3  plaintiffs' other arguments in support of coverage--namely, that

4  the underlying Keystone pleadings included factual allegations

5  stating potential claims for slogan infringement, trade dress

6  infringement, and disparagement--are unpersuasive.

                    a.    Slogan Infringement

8        A slogan is defined as a "brief attention-getting

9  phrase used in advertising or promotion or a phrase used

10 repeatedly, as in promotion." Palmer v. Truck Ins. Exch., 21

11 Cal. 4th 1109, 1120 (1999) (emphasis, internal quotation marks

12 and citations omitted).  Plaintiffs allege that "Trademark" was

13 defined in the licensing agreement and Keystone pleadings as

14 "'Keystone' . . . as well as other trademarks, trade names, or

15 service marks owned by Licensor," and that this definition is

16 broad enough to include potential claims for trade dress and

17 slogan infringement in plaintiffs' advertising.  (FAC ¶¶ 29-30.)

18 Specifically, plaintiffs argue that the term "Trademark" as used

19 in the Keystone pleadings included the phrase "Retaining

20 Excellence," which they argue qualifies as a slogan.  (Pls.'

21 Opp'n at 13 (Docket No. 32).)

22       Plaintiffs provide no legal support for their assertion

23 that "the term 'trade name' and/or 'service marks' are commonly

24 understood to appear and be included within 'trade dress' and/or

25 'slogan.'" (FAC ¶ 30.)  Plaintiffs' argument is further

26 undermined by the fact that Keystone specifically listed the

27 trademarks allegedly infringed, (FAC Ex. D ¶ 64), but nowhere

28 mentions the phrase "Retaining Excellence" and does not include

11

1  factual allegations as to how the phrase was used in advertising.

2  The Keystone Matter is therefore distinguishable from

3  Hudson Insurance Co.  In Hudson, the Ninth Circuit found that a

4  potential claim for slogan infringement existed--therefore giving

5  rise to a duty to defend--when the complaint in the underlying

6  suit specifically alleged that a website advertised a counterfeit

7  jersey that "read[] 'Steel Curtain' across the back."  See

8  Hudson, 624 F.3d at 1268-69.  The Ninth Circuit approved of the

9  district court's explanation that a potential claim for slogan

10  infringement existed because "[a] fair reading of the [underlying

11  complaint] reveals that 'Steel Curtain' is used to promote fan

12  loyalty to the Steelers . . . and a subset of Steeler players in

13  particular."  Id. at 1268.  Here, however, neither "Retaining

14  Excellence" or any other potential slogan appears in the Keystone

15  complaint.

16  Plaintiffs therefore fail to plausibly allege a duty to

17  defend based upon a potential claim for slogan infringement in

18  plaintiffs' advertising.

19                    b.    Trade Dress

20  "'Trade dress refers generally to the total image,

21  design, and appearance of a product and may include features such

22  as size, shape, color, color combinations, texture or

23  graphics.'"  Globefill Inc. v. Elements Spirits, Inc., 473 Fed.

24  App'x 685, 686 (9th Cir. 2012) (quoting Clicks Billiards v.

25  Sixshooters, Inc., 251 F.3d 1252, 1257 (9th Cir. 2001)).  "To

26  sustain a claim for trade dress infringement, [the plaintiff]

27  must prove: (1) that its claimed dress is nonfunctional; (2) that

28  its claimed dress serves a source-identifying role either because

12

1  it is inherently distinctive or has acquired secondary meaning;

2  and (3) that the defendant's product or service creates a

3  likelihood of consumer confusion." Clicks Billiards, 251 F.3d at

4  1258.

5       Plaintiffs allege that Keystone's claims under 15

6  U.S.C. § 1125(a) and (c) stated potential claims for trade dress

7  infringement.  (FAC ¶ 40; see Pls.' Opp'n at 9-11.)  The Keystone

8  pleadings, however, do not include any factual allegations

9  regarding a product's "total image, design, or appearance," nor

10 do they include any factual allegations concerning a product's

11 non-functionality.  See Clicks Billiards, 251 F.3d at 1258.

12 Keystone's claims under 15 U.S.C. § 1125(a) and (c) repeatedly

13 allege violation due to plaintiffs' "use of the Trademarks," not

14 trade dress.  (See, e.g., FAC Ex. D ¶ 256 ("Defendant's

15 unauthorized use of the Trademarks in commerce has caused

16 confusion . . . ."), ¶ 258 ("Defendant's unauthorized use of the

17 Trademarks was calculated to cause confusion"), ¶ 272

18 ("Defendant's unauthorized use of the Trademarks causes a

19 dilution of the distinctive quality of the Trademarks.").)[1]  To

20 hold that these allegations are sufficient to state a claim for

21 trade dress would be "speculat[ing} about unpled third party

22 claims to manufacture coverage," Bock, 465 Fed. App'x at 624,

23

24

25

---

26      [1]     The Keystone pleadings under 15 U.S.C. § 1125 (a) and
   (c) also lack any allegations of a "brief attention-getting
27 phrase used in advertising or promotion," Palmer, 21 Cal. 4th at
   1120, and thus fail to state a potential claim for slogan
28 infringement as well.

13

1  which the court declines to do.[2]

2         Plaintiffs therefore fail to plausibly allege a duty to

3  defend based upon a potential claim for trade dress infringement

4  in plaintiffs' advertising.

5                    c.    Disparagement

6         Finally, plaintiffs allege that the Keystone complaint

7  pleads facts giving rise to disparagement in plaintiffs'

8  advertising.  "Under California law, 'disparagement' covers

9  claims for trade libel."  Cort v. St. Paul Fire & Marine Ins.

10 Comps., Inc., 311 F.3d 979, 986 (9th Cir. 2002).  "Trade libel

11 differs from libel in that an 'action for defamation is designed

12 to protect the reputation of the plaintiff, and the judgment

13 vindicates that reputation, whereas the action for disparagement

14 is based on pecuniary damage and lies only where such damage has

15 been suffered.'"  Id. (quoting Microtec, 40 F.3d at 972).  When

16 an underlying complaint for infringement of a design patent "only

17 allege[s] that [the plaintiff] imitated its product, thereby

18 infringing its patent," "it does not follow that . . . it is,

19 therefore, disparaging it.  In point of fact, it's quite the

20 opposite--as has been oft said: imitation is the highest form of

21 flattery."  Homedics, Inc. v. Valley Forge Ins. Co., 315 F.3d

22 1135, 1142 (9th Cir. 2003); see also Everest & Jennings, Inc. v.

23 Am. Motorists Ins. Co., 23 F.3d 226, 230 (9th Cir. 1994) ("E & J

24
_____

25      [2]   Plaintiffs argue that claims under 15 U.S.C. § 1125 are
   reserved for infringement of trade dress and that a trademark may
   not form the basis for such a claim.  Plaintiffs, however, appear
26 to be mistaken on this point.  See, e.g., Visa Intern. Serv.
   Ass'n v. JSL Corp., 610 F.3d 1088, 1089-90 (9th Cir. 2010) (§
27 1125(c) claim based upon use of the "Visa" mark); Toho Co., Ltd.
   v. Sears, Roebuck & Co., 645 F.2d 788, 790 (9th Cir. 1981) (§
28 1125(a) claim based upon use of the "Bagzilla" mark).

                                  14

1 argues that allegations of patent infringement necessarily imply

2 a disparagement of title.  If this were true, all claims of

3 patent infringement would fit within a standard personal injury

4 clause.  This interpretation would permit coverage far exceeding

5 the objectively reasonable expectations of the insured based on

6 the explicit language of the policy.").

7          In Microtec, for example, the Ninth Circuit affirmed

8 that no potential claim for disparagement existed when the

9 allegations in the underlying complaint were that the plaintiff

10 "palmed off" the third party's compilers as the plaintiff's own,

11 "not that [the plaintiffs] made a false or injurious statement

12 about the quality of [the third party's] compilers."  Microtec,

13 40 F.3d at 972.  Here, as in Microtec, the allegations in

14 Keystone's underlying complaint are that plaintiffs "passed off"

15 Keystone's products as plaintiffs' own after breaching the

16 licensing agreement, (FAC Ex. D ¶ 260), "not that [plaintiffs]

17 made a false or injurious statement about the quality" of

18 Keystone's products.  Microtec, 40 F.3d at 972.  Thus, the

19 underlying Keystone pleadings did not state a potential claim for

20 disparagement.

21          Plaintiffs therefore fail to plausibly allege that the

22 Keystone Matter's pleadings included factual allegations

23 sufficient to trigger a duty to defend under the Policies'

24 "personal and advertising injury" clause.

25          2.   Property Damage Clause

26          For coverage under the "property damage" clause of the

27 Policies, the alleged property damage must be caused by an

28 "occurrence," (id. Ex. A at 1, Ex. B at 1), which is defined as

1  an "accident, including continuous or repeated exposure to

2  substantially the same general harmful conditions," (id. Ex. A at

3  40, Ex. B at 13).  "California courts have held that for there to

4  be an accident, the cause, as well as the result, must be

5  unexpected, unusual, and unforeseen."  UMG Recordings, Inc. v.

6  Am. Home Assur. Co., 321 Fed. App'x 553, 554 (9th Cir. 2008)

7  (citing Merced Mut. Ins. Co. v. Mendez, 213 Cal. App. 3d 41, 50

8  (5th Dist. 1989)).

9          Here, plaintiffs allege that the underlying Keystone

10  pleadings "alleged that Plaintiffs improperly used and retained

11  Keystone's property in the form of 'molds' (i.e., plastic, metal

12  or wooden casts used for shaping concrete stone, pavers, and

13  bricks) used as part of its operations."  (FAC ¶ 26.)  The

14  Keystone pleadings, however, clearly allege that plaintiffs'

15  withholding of the molds after breaching the licensing agreement

16  was an intentional act, not an accident.  See UMG Recordings, 321

17  Fed. App'x at 555 (finding no duty to defend under a property

18  damage clause when the underlying complaint alleged that

19  plaintiffs withheld a master recording of an album, "which is an

20  intentional act").  Thus, plaintiffs fail to plausibly allege

21  that the Keystone pleadings included facts of "property damage"

22  which would give rise to a duty to defend under the Policies.

23          Plaintiffs fail to plausibly allege that the factual

24  allegations in the Keystone Matter established defendants' duty

25  to defend under the "personal or advertising injury" clause or

26  the "property damage" clause.  Thus, any duty to defend would

27  have to arise from extrinsic facts.  See Hyundai Motor Am. v.

28  Nat. Union Fire Ins. Co., 600 F.3d 1092, 1099 n.2 (9th Cir. 2010)

16

1  ("Even if the duty to defend is not evidence on the face of the

2  complaint, the duty to defend nevertheless arises if the

3  extrinsic facts suggest that the claim may be covered.").

4      B.    Duty to Defend Arising from Submission of Extrinsic

5            Materials

6            "The determination of potential coverage is made at the

7  time the lawsuit is tendered to the insurance company."  The

8  Upper Deck Co., LLC v. Fed. Ins. Co., 358 F.3d 608, 612 (9th Cir.

9  2004) (citing Gunderson v. Fire Ins. Exch., 37 Cal. App. 4th

10 1106, 1114 (1st Dist. 1995)).  "Once an insurer determines, on the

11 basis of the complaint and the facts known to it at the time of

12 tender, that there is no potential for coverage, the insurer does

13 'not have a continuing duty to investigate or monitor the lawsuit

14 to see if the third party made some new claim, not found in the

15 original lawsuit.'"  Id. at 613 (quoting Gunderson, 37 Cal. App.

16 4th at 1117).  "If new extrinsic evidence raises a potential

17 covered claim, the insured should submit a new tender of

18 defense."  Id.  "In the absence of a new tender, the insurer is

19 not charged with knowledge of new extrinsic facts; nor is it

20 under an independent obligation to investigate the potential for

21 coverage."  Id. (citing Gunderson, 37 Cal. App. 4th at 1117).

22            Generally, "[t]he duty to defend ends with the

23 conclusion of the action . . . ."  Republic W. Ins. Co. v.

24 Stardust Vacation Club, Civ. No. 02-2318 WBS KJM, 2003 WL

25 24215016, at *2 (E.D. Cal. June 3, 2003) (Shubb, J.) (citing Buss

26 v. Superior Court of L.A. Cnty., 16 Cal. 4th 35, 46 (1997)).  As

27 explained by the California Supreme Court, "the insurer's duty to

28 defend arises whenever the third party complaint and/or the

17

1  available extrinsic facts suggest, under applicable law, the

2  possibility of covered claims." <u>Scottsdale Ins. Co. v. MV</u>

3  <u>Transp.</u>, 36 Cal. 4th 643, 657 (2005).  "The duty to defend then

4  continues <u>until the third party litigation ends</u>, unless the

5  insurer sooner proves . . . that the potential for coverage which

6  previously appeared cannot possibly materialize, or no longer

7  exists."  <u>Id.</u> (emphasis added).

8       Here, the FAC alleges that plaintiffs first tendered

9  the defense and indemnity of the underlying Keystone Matter on or

10 about November 18, 2011, and defendants first denied the tender

11 on or about January 23, 2012.  (FAC ¶¶ 42-43.)  For the reasons

12 explained above, this tender did not give rise to the duty to

13 defend.  Plaintiffs again allegedly tendered the defense, this

14 time offering extrinsic material such as advertising materials

15 that allegedly "were the actual documents which comprised the

16 subject matter of the Keystone Matter," on or about August 22 and

17 August 31, 2012.  (<u>Id.</u> ¶¶ 44-45.)  These materials allegedly

18 contained slogans and copyrighted material.  (<u>Id.</u> ¶ 45.)  The

19 underlying Keystone Matter, however, was dismissed due to

20 settlement on August 13, 2012, (Defs.' Req. for Judicial Notice

21 Ex. H),[3] <u>before</u> plaintiffs tendered the defense with extrinsic

22 materials.

23       Even assuming that the extrinsic material offered by

24

25       [3]   The court takes judicial notice of filings and orders
   in the underlying Keystone Matter, as their accuracy can be
26 "readily determined from sources whose accuracy cannot reasonably
   be questioned," but the court does not accept the truth of
27 matters asserted therein.  Fed. R. Evid. 201; <u>see</u> <u>Liberty Mut.</u>
   <u>Ins. Co. v. Indian Harbor Ins. Co.</u>, No. 11-CV-0624 BEN (NLS),
28 2012 WL 642890, at *2 n.1 (S.D. Cal. Feb. 28, 2012).

18

1  plaintiffs in support of their tender could give rise to the duty

2  to defend, plaintiffs provided the material after the Keystone

3  Matter terminated.  Since the Keystone pleadings did not, on

4  their face, give rise to a duty to defend, and any such duty

5  expired at the conclusion of the Keystone litigation, plaintiffs'

6  tender of extrinsic material after the conclusion of the lawsuit

7  did not trigger a duty to defend.  See Monticello Ins. Co. v.

8  Essex Ins. Co., 162 Cal. App. 4th 1376, 1388 (2d Dist. 2008) ("We

9  conclude the Defect List plays no role in our duty to defend

10  analysis because Monticello failed to establish said document was

11  tendered to Essex during the pendency of the underlying

12  action.").

13       Furthermore, defendants did not breach a duty to

14  investigate after plaintiffs submitted their first tender because

15  "[i]n the absence of a new tender, the insurer is not charged

16  with knowledge of new extrinsic facts; nor is it under an

17  independent obligation to investigate the potential for

18  coverage."  Upper Deck, 358 F.3d at 613.

19       Plaintiffs fail to plausibly allege that the pleadings

20  in the Keystone Matter gave rise to a duty to defend on their

21  face and also fail to plausibly allege that defendants knew of

22  extrinsic facts giving rise to the duty to defend before the

23  conclusion of the Keystone Matter.  Accordingly, the court will

24  grant defendants' motion to dismiss all claims in the FAC.[4]

25

26       [4]  Similarly to the court's holding in the February 13,
2012 Order, because plaintiffs fail to plead a duty to defend in
27  the Keystone Matter, plaintiffs' claims for declaratory judgment,
breach of contract, and breach of the covenant of good faith and
28  fair dealing must all be dismissed.  (Feb. 13, 2013 Order at 4

19

1        While leave to amend must be freely given, the court is

2 not required to permit futile amendments.  See DeSoto v. Yellow

3 Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992); Reddy v.

4 Litton Indus., Inc., 912 F.2d 291, 296-97 (9th Cir. 1990); Rutman

5 Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 738 (9th Cir.

6 1987); Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau,

7 701 F.2d 1276, 1293 (9th Cir. 1983).  Because the court has

8 already permitted plaintiffs to amend their pleadings and it

9 appears that plaintiffs are unable to state a viable claim

10 against defendants, all claims will be dismissed with prejudice

11 and without leave to amend.

12        IT IS THEREFORE ORDERED, that defendants' motion to

13 dismiss be, and the same hereby is, GRANTED.

14        The Clerk of the Court is directed to enter a judgment

15 of dismissal in accordance with this Order and close the file.

16 DATED:    May 16, 2013

17

18 _____
   WILLIAM B. SHUBB

19 UNITED STATES DISTRICT JUDGE

20

21

22

23 _____

24 (citing Rosen v. Nations Title Ins. Co., 56 Cal. App. 4th 1489,
   1496 (2d Dist. 1997)).)

25        In addition, while plaintiffs do not argue in support
   of the duty to indemnify in their briefs, the FAC repeatedly

26 alleges that defendants breached both the duty to defend and the
   duty to indemnify.  (See FAC ¶¶ 59-60.)  "Where there is no duty

27 to defend, there cannot be a duty to indemnify."  Certain
   Underwriters at Lloyd's of London v. Superior Court, 24 Cal. 4th

28 945, 958 (2001).  Thus, to the extent plaintiffs' claims are
   based upon the duty to indemnify, they will be dismissed.